SOUTHWESTERN ENERGY COM-
PANY; Seeco, Inc.; and Arkansas
Western Gas Company, Plaintiffs,

v.

Marilyn EICKENHORST, Defendant
and Counter–Plaintiff,

v.

SOUTHWESTERN ENERGY COMPANY;
Seeco, Inc.; Arkansas Western Gas
Company; Thomas A. Mars, Individually
and as a Partner in Everett, Shemin,
Mars, & Stills, and the Law Firm of
Everett, Shemin, Mars, & Stills, Coun-
ter–Defendants.

Civil No. 96–5075.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

March 18, 1997.

Thomas Allan Mars, Everett, Mars, She-min & Stills, Fayetteville, AR, for plaintiffs.

Eugene T. Kelley, Kelley Law Firm, Rogers, AR, David B. Horne, Kincaid, Horne, Trumbo & Hogue, Fayetteville, AR, Laurence L. Pinkerton, Pinkerton & Finn, Tulsa, OK, Judith A. Finn, Pinkerton & Finn, P.C., Tulsa, OK, for defendant.

*AMENDED MEMORANDUM OPINION*

H. FRANKLIN WATERS, Chief Judge.

Currently before this court are defendant's two motions for partial summary judgment. Defendant's first motion for partial summary judgment, filed on November 22, 1996, seeks judgment as a matter of law on plaintiffs' theft of trade secrets claim. Defendant's second motion for partial summary judgment, filed on December 24, 1996, seeks judgment as a matter of law on plaintiffs' breach of contract claim. Collectively, defendant's two motions address the entirety of the claims raised in plaintiffs' first amended complaint. For the reasons set forth below, the court finds that said motions should be, and hereby are, granted in part and denied in part.

## I. Relevant Facts

The court provided a rather detailed recitation of the alleged facts presented by this case in its memorandum opinion of November 21, 1996, denying defendant's motion for a more definite statement and motion to dismiss the breach of contract claim. Here, the court will reiterate those facts for the' sake of clarity.[1]

Southwestern Energy Company (SWN) is the holding company for several wholly owned subsidiaries including SEECO, Inc., and Arkansas Western Gas Company (AWG). AWG is a regulated gas utility that provides natural gas to residential, commercial, and industrial customers in Arkansas and Missouri. SEECO is engaged in the development, production, and sale of natural gas. A large portion of SEECO's gas production is sold to AWG.

Marilyn Eickenhorst (Eickenhorst) is a licensed attorney. From 1994 until December of 1995, Eickenhorst was an associate in a Houston law firm. On or about January 4, 1996, Eickenhorst resigned from the law firm.

Beginning in early 1995, the Houston law firm was retained as outside counsel by En-

---

1. As was pointed out in our November 21, 1997, memorandum opinion, this summary of relevant "facts" comes primarily from the allegations of the complaint and is made only for the purpose of ruling on the pending motions. Thus, the matters set forth in such summary should not be considered to be "findings" by the court for any other purpose.

ron Oil & Gas Company (Enron), a natural gas production company, to represent Enron in connection with an investigation of, and potential claims related to, the alleged failure of SWN and its subsidiaries to pay Enron overriding royalties on certain oil and gas leases on lands in Franklin, Johnson, Sebastian, Crawford, and Conway counties in Arkansas.

Eickenhorst worked on the case for Enron under the supervision and direction of C. Robert Vote (Vote), Assistant General Counsel, Litigation, in Enron's legal department, and under the supervision of Thomas Fulkerson (Fulkerson) a partner in the Houston law firm. Eickenhorst was primarily responsible for the research and investigation of Enron's claims.

In June of 1995, Eickenhorst wrote a letter to SEECO's in-house attorneys, outlining Enron's potential claims for unpaid overriding royalties based on 1939 and 1943 assignments and for underpayment of overriding royalties based on the administration of Contract No. 59. In August of 1995, Eickenhorst asked SWN to fully cooperate and exchange information and documents relating to Enron's claims and to extend a tolling agreement previously entered into to a mutually agreeable date.

To avoid litigation, SWN agreed to giving Eickenhorst and Enron's in-house counsel virtually unlimited access to SWN's internal documents. However, plaintiffs allege that SWN first required Enron, Eickenhorst, and the Houston law firm to agree that SWN's confidential information and information derived therefrom would not be used for any purpose other than the evaluation and pursuit of Enron's claims for the nonpayment and underpayment of overriding royalties.

A letter agreement was drafted by Eickenhorst. The agreement provides:

This will confirm our agreement that the documents made available (including information derived therefrom) (1) to EOG [Enron] Oil & Gas Company and (2) to SEECO and/or AWG by EOG, will only be used by the parties in negotiating, settling and/or discharging the claims for additional overriding royalties for oil and gas leases, mineral interests and mineral deeds which may cover land in Franklin, Johnson, Sebastian, Crawford and Conway Counties, Arkansas. This agreement does not include documents and information that is generally available, and this agreement will terminate two years from the date the documents are made available.

This letter agreement dated August 28, 1995, was on the Houston law firm's stationery and signed by Eickenhorst.

Following execution of the letter agreement, Eickenhorst and Enron were given access to the following: production data of SEECO, including detailed information regarding volume and prices; SEECO's lease files; maps and plats showing SEECO's ownership and production; SEECO's royalty owner records, including correspondence with royalty owners and names and addresses of royalty owners; SEECO's title opinions and abstracts; SEECO's lease rental receipts; SEECO's division order records; protected versions of pre-filed testimony, exhibits, depositions, and hearing testimony in APSC docket no. 92–028–U; and selected gas sales contracts between SEECO and unaffiliated producers. Plaintiffs allege that most of this information is not generally available either from public sources or from sources other than SWN. Even that information that could be obtained from public sources, would, it is alleged, take several years to accumulate and assimilate.

Plaintiffs allege this information is kept in the strictest confidence and that disclosure to third persons would put SWN or its subsidiaries at a competitive disadvantage. Plaintiffs further allege that although royalty owners had never asserted or threatened to assert the type of claims asserted by Enron, the information Enron obtained from SWN would also provide a factual basis for evaluating such a claim by royalty owners under the theories of liability articulated by Enron.

During the negotiations, Eickenhorst suggested that a settlement of Enron's claim would minimize the possibility of a similar lawsuit being filed on behalf of royalty owners whose gas was sold under Contract 59. Eickenhorst is also alleged to have suggested that settlement of Enron's claims would mini-

mize SWN's potential exposure to Meridian Oil.

Eickenhorst was provided a great deal of information during 1995. On October 3, 1995, after Eickenhorst verbally requested SWN to provide her with a computer report reflecting production volumes and prices for approximately 250 wells, Eickenhorst drafted a second letter agreement. This agreement provides as follows:

> This will confirm our telephone conversation regarding the confidentiality of the computer report being generated by SEE-CO and AWG reflecting production volumes and prices for approximately 250 wells selected by EOG for analysis. Enron Oil & Gas Company agrees to maintain the confidentiality of the computer report and the information derived therefrom (except as to information that is generally available or available from other sources such as Dwight's and PI), and EOG further agrees that such information will be used solely for the purposes of analyzing and prosecuting Enron's claims for additional overriding royalties reserved under the Agreement and Conveyance dated December 12, 1939, and will not be disseminated to any person or entity not necessary for the analysis and prosecution of such claims.

This letter agreement dated October 3, 1995, was on the Houston law firm's letter head and signed by Eickenhorst.

By the time the second letter agreement was drafted, plaintiffs allege Eickenhorst had already planned to cause the filing of a class action suit against SWN, SEECO, and AWG on behalf of royalty owners as soon as she could find a client. Eickenhorst took steps toward initiating such a lawsuit. When plaintiffs discovered this, they attempted to get an agreement from Enron and Eickenhorst that the confidential information would not be used. Eickenhorst took the position that she was not bound by the letter agreements.

On May 15, 1996, Enron filed suit against the plaintiffs in the Chancery Court of Franklin County. On May 16, 1996, Enron terminated its relationship with Eickenhorst and requested that she return to Enron all documents she obtained from plaintiffs while acting in her capacity as an attorney for Enron. On May 24, 1996, Eickenhorst caused to be filed a proposed class action complaint against the plaintiffs in the Sebastian County Circuit Court.

In preparing the class action complaint, plaintiffs contend Eickenhorst used information that she learned of and developed during her representation of Enron. This information was provided pursuant to the letter agreements. The complaint asserts causes of action for breach of contract and theft of trade secrets.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.1987); Fed.R.Civ.P. 56. The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also AgriStor Leasing v. Farrow*, 826 F.2d 732 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir.1979). In *Counts v. M.K.—Ferguson Co.*, 862 F.2d 1338 (8th Cir.1988), the court, reviewing the burdens of the respective parties, stated:

[T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*, '[to] point[ ] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339, quoting, *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original).

However, the Court of Appeals for this circuit has also held that the court, in ruling on the motion for summary judgment, must give the non-moving party "the benefit of the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.*, 883 F.2d 594, 598 (8th Cir.1989) (*citing Trnka v. Elanco Products Co.*, 709 F.2d 1223 (8th Cir.1983)).

### B. Injunctive Relief

In determining whether to grant defendant's motions for summary judgment, this court is mindful of the type of relief plaintiffs seek in this action. The defendant has raised the issues of whether the plaintiffs may maintain their action under theft of trade secrets and breach of contract; however, this court should also consider the question of whether the facts alleged could warrant the issuing of an injunction.

■ In attempting to protect one's trade secrets, it is not necessary to wait until actual harm occurs in order to enjoin use or disclosure. *Baxter International, Inc. v. Morris*, 976 F.2d 1189, 1194 (8th Cir.1992). Such a rule would negate any real benefit to trade secrets protection because, under most scenarios, relief could not be obtained until after the secrecy was lost. Instead, injunctive relief is a tool by which the court provides protection of trade secrets by preventing disclosure or use. However, injunctive relief should be granted to protect trade secrets where there is a belief, not simply that future acts are threatened, but that such acts will in all probability be committed. *Id.*

A good comparison to the equity power that this court is being asked to consider invoking can be seen in those cases involving covenants not to compete. As the Arkansas Supreme Court has explained:

The breach of a covenant not to compete is, of course, of a continuing nature, and an action for damages is hardly adequate, mainly because of the extreme difficulty in determining the amount of damage caused by loss of business. It appears that the only realistic relief for a breach of this type of contract is by injunction.

*Bailey v. King*, 240 Ark. 245, 249, 398 S.W.2d 906 (1966).

■ Injunctive relief is also available as a means of obtaining equity in cases of breach of contract. As the Arkansas Supreme Court has noted, an injunction is a proper remedy for breach of contract where there is no adequate remedy of law and it would do substantial justice between the parties by compelling the defendant to carry out her obligation or lose all the benefits of her breach. *Hyde Vending Company v. Wayne Poultry Co.*, 252 Ark. 355, 360, 479 S.W.2d 250 (1972). Unless, due to the nature of the contract in question, there is a reason or public policy which precludes injunctive relief, a court can interfere in order to restrain conduct contrary to the contract. *Id.* Thus, both plaintiffs' breach of contract and theft of trade secrets claims provide this court with potential grounds for granting injunctive relief.

As discussed more below, plaintiffs' complaint alleges all three types of misappropriation addressed by the statute—use, disclosure, and improper acquisition. However, plaintiffs' claim as to defendant's "improper acquisition" fails to state grounds upon which this court might consider granting such relief. Obviously, this court cannot enjoin the defendant from taking actions that she has

already completed. Plaintiffs do not allege that defendant will continue to improperly acquire information from the plaintiffs. Thus, since the plaintiffs only seek injunctive relief, and did not claim damages, this court must grant the defendant's summary judgment motion with regards to plaintiffs' claim of improper acquisition of trade secrets. Of course, this court's ruling in no way affects the rights of the parties to introduce evidence regarding defendant's alleged improper acquisition where it is material to the plaintiffs' other arguments.

### C.  Theft of Trade Secrets

Defendant seeks summary judgment on plaintiffs' theft of trade secrets claim stating that plaintiffs cannot establish the essential element of "misappropriation" under the Arkansas Trade Secrets Act (the "Act"). Defendant also seeks partial summary judgment with regards to whether plaintiffs can prove irreparable harm.

Despite defendant's apparent representation that her arguments about the Act are well supported by the law, this appears to the court to be a question of first impression. The court is unaware of, and the parties have not offered for the court's consideration, any case from any jurisdiction which seems directly on point. The main question that the court must consider is whether a trade secrets act may be applied to prevent an attorney from breaching confidentiality agreements with a non-client in order to use information obtained from such agreements to establish a class action lawsuit against the non-client. To a limited extent, this court holds that it may.

The Act allows for a court to issue injunctive relief from either actual or threatened misappropriation. ARK.CODE ANN. § 4–75–604(a) (Repl.1996). Defendant's claim that the plaintiffs are unable to show "misappropriation" centers on the definition of the term itself. The Act defines misappropriation as follows:

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret; or

(ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(a) Derived from or through a person who had utilized improper means to acquire it;

(b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

ARK.CODE ANN. § 4–75–601(2) (Repl.1996).

The plaintiffs' amended complaint explicitly alleges that the defendant violated the Act by improper acquisition and use. The complaint also states an implicit claim of disclosure. Defendant argues that plaintiffs fail, as a matter of law, to prove either the improper acquisition or use prongs of the definition.

### 1.  The Use Prong

Defendant, relying on what she claims to be a "well established" point of law, argues that plaintiffs cannot sustain a trade secrets action under the "use prong" of misappropriation without demonstrating that the defendant received some sort of unfair trade advantage. Plaintiffs respond that defendant's alleged conduct meets the "use" aspect of misappropriation. Plaintiffs argue that defendant used the trade secrets in her representation of the class action. Alternatively, the plaintiffs argue that the landowners that defendant represents are competitors of the plaintiffs.

■ The court is quite convinced that the proposition advanced by the defendant is not,

by any means, "well established" as a rule of law. The court, however, agrees that the "use" plaintiffs allege is not precluded by the Act. The defendant relies primarily on two cases out of Louisiana to support her proposition that the Act does not apply to the case at hand.

The first case defendant relies upon is *Omnitech Int'l, Inc. v. Clorox Co.,* 11 F.3d 1316 (5th Cir.1994). *Omnitech* involved a suit brought by a roach spray manufacturer against a potential investor for various grounds including violations of the Louisiana Trade Secrets Act (the "LTSA"). *Id.* In *Omnitech,* the potential investor received confidential trade secrets as a result of a non-disclosure agreement and then backed out of the purchase after acquiring a competitor. *Id.*

The relevant question presented to the *Omnitech* court was whether the LTSA applied to the circumstances presented. Since all of the parties conceded that no disclosure to outside third parties occurred, the court restricted its interpretation to simply the alleged offensive "use" of the trade secret. *Id.* at 1323.

In considering the question, the court relied upon a Louisiana state court's determination that the purpose of the LTSA was to prevent a person or business from profiting from another's trade secrets, and therefore, creating an unfair competitive advantage. *Id.* at 1325. The court, therefore, held that a trade secrets action under the "use" prong required that the plaintiff prove that the defendant received some sort of unfair trade advantage. *Id.* The court concluded that such an unfair trade advantage was not present where the acquirer of the secret merely "used" the secret in the sense that it made the acquirer more knowledgeable in comparing competitive target companies. It is relatively clear that the *Omnitech* court did not directly address the situation currently before the court—whether the use prong can be satisfied by a lawyer who relies on trade secrets to help instigate and form a civil lawsuit against the firm holding the secrets.

The second case defendant primarily relies upon more closely resembles our alleged fact pattern. In *Stork–Werkspoor Diesel V.V. v. Koek,* 534 So.2d 983 (La.App.1988), a ship engine manufacturer brought suit against a former employee for violations of the LTSA when he served as a consultant for a products liability action against the manufacturer. The manufacturer was seeking an injunction to prevent the former employee's further consultation in the lawsuit. The *Koek* court ruled that, since the information was not "used in an unfairly competitive manner," the plaintiff could not enjoin the former employee under the LTSA. The court added that holding the act applicable would allow product liability tortfeasors to cloak otherwise discoverable evidence in the guise of trade secrets.

While this court is unconvinced that the question addressed by the *Koek* court was directly on point to the present action, the logic reflected in *Omnitech* and *Koek* is hard to deny. As outlined below, the statute separates "use" from "disclosure" and either or both may support an action.

Defendant further claims that her interpretation is supported by the comments to the Uniform Trade Secrets Act which state that injunctive relief should last only so long as necessary to prevent a commercial advantage for a good faith competitor.

The aim of trade secrets law is to encourage businesses to invest resources in invention and discovering more efficient methods of production. *Pioneer Hi–Bred Int'l. v. Holden Foundation Seeds, Inc.,* 35 F.3d 1226, 1238 n. 42 (8th Cir.1994). Thus, the Act must necessarily be read as attempting to prevent one from unfairly using a trade secret of another in an anti-competitive manner or disclosing it so that others could use it. Thus, this court agrees that the "use" prong of the misappropriation definition requires that the use be for competitive reasons in order to give rise to a cause under the Act. The use that plaintiffs allege fails to meet this anti-competitive burden.

As noted above, plaintiffs argue, alternatively, that the class action represents a competitor to the plaintiffs. The court finds this argument unpersuasive. Regardless of whether the court could conclude that the class represented competitors of the plain-

tiffs, the plaintiffs fail to allege that the trade secrets have been or will be used in an anti-competitive manner. For the reasons noted above, the lawsuit itself cannot be used to support the contention of "use" plaintiffs must prove.

### 2. Disclosure

This court's ruling regarding the nature of the "use" prong of the definition of misappropriation is not dispositive of all of the plaintiffs' claims under the Act. Thus far, the court's inquiry has been limited to that reviewed by the *Omnitech* court—only the use aspect of the definition. Upon review of the statute, it is clear that misappropriation is defined to include improper acquisition, disclosure, and use of trade secrets. Unlike *Omnitech*, the present case alleges improper acquisition, disclosure, and use of trade secrets. The test of whether the "improper acquisition" and "disclosure" aspects of the definition are met is inherently different from that of "use."

■ As noted above, this court thinks that the plaintiffs have implied a claim of misappropriation based upon the defendant's disclosure of trade secrets to third parties. The comments to the Act make clear that the "use/disclosure" vein of the misappropriation definition allows for either aspect to qualify. The comments explain that "[b]ecause the trade secret can be destroyed through public knowledge, the unauthorized disclosure of a trade secret is also a misappropriation." ARK.CODE ANN. Commentaries to the Uniform Trade Secrets Act at 705 (Repl.1995).

■ Allowing the plaintiffs to prevent disclosure through an injunction fits with the purposes of the Act. In order to provide the plaintiffs true security, they must not only be protected from the defendant's anti-competitive use of the secrets, but also, from the defendant's ability to publicly disclose such secrets. Public disclosure of the plaintiffs' secrets would render the protections under the Act meaningless.

■ It is clear to this court that plaintiffs have alleged that defendant has disclosed, and will inevitably continue to disclose trade secrets to third parties. The fact that defen-

dant may not have disclosed the material for competitive reasons is immaterial. The Act is designed to prevent nondisclosure to third parties irrespective of motive so that the owner of the trade secret may reasonably maintain its secrecy. If the Act allowed the information to freely pass into the public arena so long as the messenger had no anti-competitive reasons, then the Act would provide no real protection at all. Misappropriation may be proven and an injunction granted by demonstrating that the individual or entity will inevitably disclose the trade secrets if not enjoined. *See PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir.1995).

The disclosure in this case was significantly different than that present in *Koek*. In *Koek*, the defendant was not one of the attorneys in the underlying action and secrecy could easily have been safeguarded through the use of protective orders. In this case, however, it is alleged that defendant was actively gathering and disclosing information without the knowledge of the plaintiffs. The protections available in *Koek* were thus unavailable to the plaintiffs here. Due to the nature of the attorney-client relationship the defendant might have with any future third parties, it would be impossible for this court to adequately assure the maintenance of plaintiffs' secrets.

■ Defendant argues that plaintiffs may not be awarded injunctive relief because the alleged conduct is mere speculation. Mere speculation of disclosure will not support a verdict for misappropriation. *Sip–Top, Inc. v. Ekco Group, Inc.,* 86 F.3d 827, 830 & 832 (8th Cir.1996). However, a finding of misappropriation may be made through reasonable inferences drawn from the evidence. *Id.* The court is convinced that the facts as alleged are such that a reasonable trier of fact might conclude that disclosure will occur.

■ Direct evidence of theft of trade secret is rarely available and not required in order to maintain the action. *Pioneer Hi–Bred,* 35 F.3d at 1239. Instead, a plaintiff may maintain an action for theft of trade secrets based entirely on circumstantial evidence. *Id.*

This case involves not simply the trade secrets themselves, but a product derived from those trade secrets—the underlying claim and complaint. Proof of derivation removes the possibility of independent development and thus further supports the court's finding of misappropriation. *Pioneer Hi-Bred,* 35 F.3d at 1240. Under these circumstances, a reasonable trier of fact could conclude that plaintiffs are faced with a definite possibility of substantial future harm.

### D. Breach of Contract

Defendant seeks summary judgment on plaintiffs' breach of contract claim based on four arguments: (1) that no contract existed between plaintiffs and defendant; (2) that defendant signed the agreements solely as and agent, and thus, lacks personal liability; (3) that defendant did not breach the agreements; and (4) that plaintiffs cannot prove irreparable harm.

Defendant argues that the terms of the contract are unambiguous and bind simply the corporate entities and not herself in her individual capacity. Plaintiffs argue that the contracts bind not only the corporate entities, but also the defendant and her law firm.

■■■ The terms of the agreement do not appear to the court to be necessarily unambiguous. The plaintiffs allege, and for the purposes of determining this motion the court must assume as true, that the defendant drafted the letter agreements in question. Thus, the agreements must be interpreted in a light most favorable to the plaintiffs. Application of this rule would appear to be especially appropriate where, as here, the drafter of the agreement is the party attempting to escape its provisions and the only party who was, at the time, in a position to craft the ambiguities so as to benefit herself. In such a light, a reasonable trier of fact could determine that all parties involved with the negotiations, including the corporations and their employees and the law firms and attorneys handling the dispute, were bound by the agreements.

■■■ The primary rule in construing the contract is to, if possible, ascertain and give effect to the parties' intentions when entering into the agreement. *Harris v. Stephens Prod. Co.,* 310 Ark. 67, 72, 832 S.W.2d 837 (1992). The court cannot imagine that the parties did not intend that all who had access to the disclosed material would be bound by the agreements. To hold otherwise would be to create an absurd result—contracting to assure confidentiality while requiring none involved to hold anything in confidence.

Defendant goes on to argue that she is not liable because she signed the agreements solely in her capacity as an agent. Plaintiffs argue that defendant can be held personally liable even as an agent because an attorney may be excepted from the general rules of agency or because defendant agreed to be bound by the agreements. Since the court has determined that a trier of fact could have concluded that the defendant was a party to the contract, this point is moot; however, the court will discuss the issue for the sake of clarity.

■■■ Generally, the rules of agency apply to the attorney-client relationship. *Peterson v. Worthen Bank & Trust Co.,* 296 Ark. 201, 204, 753 S.W.2d 278 (1988). Under such an approach, the acts of the attorney are considered to be those of the client. *Id.* However, such is not necessarily true in the case of fraud. *Id. See also Rowland v. Gastroenterology Assoc., P.A.,* 280 Ark. 278, 657 S.W.2d 536 (1983). Here plaintiffs are alleging that the defendant acquired the information fraudulently. Thus, since defendant allegedly obtained the information by misrepresenting her motives to the plaintiffs, even if defendant was not bound as a party to the contract, she would be bound by the fact that she obtained plaintiffs' agreement pursuant to knowing misrepresentations.

Defendant further argues that it is undisputed that she did not breach the agreements and that the complaints were drafted from public knowledge. Plaintiffs deny that the question of whether defendant breached the agreements is undisputed.

The court cannot understand defendant's contention that it is undisputed that she did not breach the agreements. The fact that she breached the agreements is a major alle-

gation of the plaintiffs' case. The plaintiffs have supported this allegation with evidence that defendant was entering into the agreements while simultaneously using the confidential information she received to construct a class action against the plaintiffs.

Finally, defendant argues that plaintiffs' alleged irreparable harm is too speculative to allow for injunctive relief. Plaintiffs argue that the threat of disclosure of confidential information is sufficient to establish irreparable harm.

This court has previously ruled that the plaintiffs have stated a claim for threatened future harm. If the plaintiffs can show that the defendant will inevitably disclose trade secrets if she continues to represent the class action, then the irreparable harm requirement is satisfied.

### III. Conclusion

For the reasons outlined above, this court finds that plaintiffs may maintain their action for injunctive relief with respect to their claims that defendant disclosed trade secrets in violation of the Act and that defendant breached her contractual agreement regarding the use and confidentiality of said trade secrets. Plaintiffs may not maintain their action for injunctive relief with respect to defendant's "improper acquisition" or "use" of trade secrets under the Act. Thus, defendant's motions for summary judgment are granted in part and denied in part. An order in accordance herewith will be concurrently entered.