**UNISOURCE WORLDWIDE, INC., Plaintiff,**

v.

**SOUTH CENTRAL ALABAMA SUPPLY, LLC, et al., Defendants.**

No. CIV.A. 01–D–1000–N.

United States District Court, M.D. Alabama, Northern Division.

Dec. 14, 2001.

Michael Lester Bell, Robin H. Graves, Terrence W. McCarthy, J. Chandler Bailey, Lightfoot, Franklin & White, L.L.C., Birmingham, for Unisource Worldwide, Inc., plaintiffs.

Joseph (Jay) Brady Lewis, Law Offices of Jay Lewis, Montgomery, Ben E. Bruner, Ben E. Bruner, Attorney at Law, Montgomery, for South Central Alabama Supply, LLC, Trevor Oswalt, Larry Oswalt, Felicia Oswalt, Larry Mynott, defendants.

### *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

Before the court is a Motion For A Temporary Restraining Order And Preliminary Injunction ("Motion") filed by Plaintiff Unisource Worldwide, Inc. ("Plaintiff") on August 14, 2001.[1] Defendants in this action are South Central Alabama Supply,

---

1. Ruling on both the Temporary Restraining Order and the Preliminary Injunction would, at this stage, be duplicative. Thus, the court construes Plaintiff's Motion solely as a Motion For Preliminary Injunction.

LLC ("SCAS"), Trevor Oswalt, Larry Oswalt, Felicia Oswalt, and Larry Mynott (collectively, "Defendants").

The court held hearings on Plaintiff's Motion on the afternoons of August 20 through August 23, 2001. The parties have submitted numerous briefs in support of and in opposition to their respective positions.

After careful consideration of the arguments of the parties presented at the hearing and in briefs, the relevant law, and the record as a whole, the court finds that Plaintiff's Motion For Preliminary Injunction is due to be granted.

## I. JURISDICTION AND VENUE

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity of citizenship). The parties do not contest personal jurisdiction or venue.

## II. PROCEDURAL HISTORY AND BACKGROUND FACTS

Both Plaintiff and SCAS are in the business of providing cleaning supplies to third parties such as hospitals. Defendant Trevor Oswalt began his employment with Plaintiff as a salesman in the fall of 1997.[2] He sold industrial cleaning chemicals and supplies for Plaintiff in Little Rock, Arkansas.[3] Trevor Oswalt entered into a Non-Competition Agreement with Plaintiff, which prohibited him from competing in the sale of the same goods as Plaintiff, in fourteen Arkansas counties, for a period of eighteen months after his employment with Plaintiff ended.[4] Trevor Oswalt also entered into a second contract with Plaintiff's predecessor,[5] titled "Confidentiality and Patent Agreement"[6] which agreement Plaintiff may enforce as a successor. *Sevier Ins. Agency, Inc. v. Willis Corroon Corp. of Birmingham,* 711 So.2d 995, 1000–01 (Ala.1998).[7] The Confidentiality Agreement prohibited Trevor Oswalt from disclosing "Confidential Information" including, but not limited to "models, drawings, memoranda, and other materials, documents or records of a proprietary nature; information relating to research, finance, accounting, sales personnel, management and operations; and information particularly relating to customer lists, price lists, customer service requirements, costs of providing service and equipment, and equipment maintenance costs."[8] There was no geographic or time limitation in the Confidentiality Agreement.

Trevor Oswalt's largest account during his employment with Plaintiff was the Service Professionals account.[9] Trevor Oswalt's father, Larry Oswalt, was senior vice president of Service Professionals during the three-and-a-half years that Trevor Oswalt was employed by Plaintiff.[10] Defendants Larry Oswalt and Felicia Oswalt were also employed by Service Professionals.[11] Service Professionals is a subsidiary of Baptist Health Systems and

2. Tr. at 22.

3. *See* Tr. at 32, 73.

4. Tr. at 22–23; Pl.Ex. 1.

5. Tr. at 22–23; Pl.Ex. 2.

6. Only the confidentiality provisions of this agreement are relevant to this action. Thus, for brevity, the court refers to this agreement as the "Confidentiality Agreement."

7. The court notes that counsel for Defendants misrepresented the holding of this case to the court during the hearings. Tr. at 292–93. The court admonishes Defense counsel to more thoroughly examine cases before representing to the court the law therein.

8. Pl.Ex. 2.

9. Tr. at 27.

10. Tr. at 137,

11. Tr. at 318–19.

is located in North Little Rock, Arkansas, which is within one of the fourteen counties listed in the Non–Competition Agreement.[12] The goods purchased by Service Professionals in North Little Rock went to Baptist Health Systems facilities in both Arkansas and Alabama.[13]

Service Professionals ceased purchasing cleaning supplies from Plaintiff sometime around April, 2001, and began purchasing supplies, at least for Baptist Health Systems facilities in Alabama,[14] from SCAS.[15] One of the Service Professional representatives involved in the decision to switch from Plaintiff to SCAS was Larry Oswalt.[16]

On March 16, 2001, Trevor Oswalt resigned from his employment with Plaintiff, to take a job in the tobacco industry.[17] That job fell through at that time.[18] Thereafter, Trevor Oswalt began his employment with SCAS. Testimony conflicts as to when Trevor Oswalt became employed with SCAS, but it was some time in the first half of April, 2001.[19]

Regardless of when Trevor Oswalt became employed by SCAS, he is President of the company, and has owned one-third of the company since it was formed in June, 2001.[20] Larry Mynott, who, like Trevor, was a former employee of Plaintiff, is the Vice President of SCAS and also owns one-third of the company. Felicia Oswalt, Trevor's step-mother, is another Vice President of the company, and owns the final one-third of the company. SCAS sells supplies similar to those that Plaintiff sells.[21] Defendants Felicia Oswalt, Larry Oswalt, and Larry Mynott were all suspended from their employment at Service Professionals in May, 2001, due to a conflict of interest between their employment with Service Professionals and their dealings with SCAS.[22] Larry Oswalt's employment with Service Professionals was terminated in July, 2001, and he claims to be currently unemployed.[23]

Plaintiff argues that SCAS was able to take the Service Professionals account from Plaintiff because Trevor Oswalt 1) breached his Non–Competition Agreement with Plaintiff; 2) breached his Confidentiality Agreement with Plaintiff; and 3) violated the Alabama Trade Secrets Act, Ala.Code §§ 8–27–1 to 8–27–6.

Plaintiff alleges that Trevor Oswalt provided its confidential pricing information to SCAS and competed, as President of SCAS, directly with Plaintiff for the Service Professionals account relating to the Baptist Health Systems facilities in Alabama, facilities that were originally purchasing cleaning supplies from Plaintiff, in Faulkner County, Arkansas,[24] through Service Professionals. However, as developed during the hearings, SCAS could have obtained the confidential pricing information through other potentially illegal

12. Tr. at 27–28.

13. Tr. at 69.

14. Tr. at 249. This case only pertains to Baptist Health Systems facilities in Alabama. Tr. at 99–102, 339.

15. Tr. at 48–49; 319.

16. Tr. at 319.

17. Tr. at 22, 81–82, 122.

18. Tr. at 139–40.

19. Tr. at 124–35.

20. Tr. at 84–85.

21. Tr. at 85–86.

22. Tr. at 318–19.

23. Tr. at 323, 297.

24. Faulkner County, Arkansas is one of the counties listed in the Non–Competition Agreement between Plaintiff and Trevor Oswalt.

means, such as violations of a Confidentiality Agreement between Larry Mynott and Plaintiff,[25] signed when he was employed by Plaintiff, or violations of the Alabama Trade Secrets Act by any of the Defendants.

Plaintiff seeks both a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure and Alabama Code §§ 8–27–1 to 8–27–6,[26] restraining and enjoining Defendants from the following: 1) directly or indirectly using or disclosing the confidential information of Plaintiff or 2) engaging in the sale of, solicitations of orders for, or providing services for any product or goods formerly solicited or sold to Plaintiff's customers by Trevor Oswalt while employed by Unisource, within fourteen Arkansas counties.[27] Plaintiff also seeks all costs and expenses incurred in connection with this action, including its reasonable attorneys' fees. Plaintiff demands a trial by jury.

## III. DISCUSSION

The Eleventh Circuit Court of Appeals has held that "[i]n this Circuit, 'a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'' as to the four prerequisites." *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (1998) (citations omitted). " 'The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.' " *Suntrust Bank v. Houghton Mifflin Co.,* 268 F.3d 1257, 1268 (11th Cir.2001) (quoting *Northeastern Fl. Chapter of Ass'n of Gen. Con-*

*tractors of Am. v. City of Jacksonville, Fl.,* 896 F.2d 1283, 1284 (11th Cir.1990)). A Plaintiff must establish the following four prerequisites in order to receive a preliminary injunction:

(1) that there is a substantial likelihood plaintiff will prevail on the merits; (2) that there is a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may do to the defendant; *and* (4) that granting the preliminary injunction will not disserve the public interest.

*Id. See also* Fed.R.Civ.P. 65(b). However, "none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *State of Texas v. Seatrain Int'l,* 518 F.2d 175, 180 (5th Cir.1975).[28]

### A. Substantial Likelihood Of Success On The Merits

#### 1. Non–Competition Agreement

##### a. Choice of Law

The Non–Competition Agreement provides that Florida law applies to the agreement.[29] The parties dispute this choice of law provision. Non–Competition agreements are state law contracts, and thus the court must apply the appropriate state substantive law in analyzing the agreement. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The court must therefore determine which state's law controls the agreement. Plain-

---

25. Tr. at 170–71.

26. The Alabama Trade Secrets Act allows injunctive and other equitable relief as appropriate with respect to any actual or threatened misappropriation of a trade secret.

27. Mot. at 5–6.

28. Decisions of the Fifth Circuit filed prior to October 1, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

29. Pl.Ex. 2.

tiff argues that Florida law should be applied to the Non–Competition Agreement, or, at the very least, Arkansas law, but not Alabama law. Defendants, on the other hand, argue that Alabama law should be applied.

■ The substantive choice-of-law rules of the state in which the court sits are used to determine which state's law applies. *Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1444 (11th Cir.1991). "Alabama has long recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement." *Cherry, Bekaert, & Holland v. Brown,* 582 So.2d 502, 506 (Ala.1991). "However, this principle is qualified by principles set out in *Blalock v. Perfect Subscription Co.,* 458 F.Supp. 123 (S.D.Ala.1978), and the cases following it." *Brown,* 582 So.2d at 506. The principles referred to by the courts in *Blalock* and *Brown* are from the Restatement (Second) of Conflict of Laws §§ 187 and 188. *Brown,* 582 So.2d at 506–507. Section 188, in turn, points to further considerations in § 6. Section 187 provides, in pertinent part, that:

> [t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless ... (b) application of the law of the above chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Brown,* 582 So.2d at 507.

■ The issues that must be addressed by the court are: 1) whether application of Florida law "would be contrary to a fundamental policy of a state which"; 2) "has a materially greater interest than the chosen state in the determination of the particular

issue"; and 3) "under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

### i. Florida Law On Covenants Not To Compete Is Contrary To A Fundamental Policy Of Alabama

As a matter of law, "Alabama's policy against covenants not to compete is a fundamental public policy." *Brown,* 582 So.2d at 507. Alabama has codified its covenant not to compete rule in Ala.Code § 8–1–1(b), which provides the following for a covenant not to compete to be enforceable:

> [o]ne who is employed as an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city or part thereof so long as the ... employer carries on a like business therein.

Ala.Code § 8–1–1(b). This statute has been construed as allowing the territory included in a covenant not to compete to include part of Alabama, all of Alabama, and even more than Alabama. *James S. Kemper & Co. Southeast v. Cox & Assocs.,* 434 So.2d 1380, 1385 (1983) (citing *Parker v. Ebsco Indus., Inc.,* 282 Ala. 98, 209 So.2d 383 (1968) (Merrill, J.)).

In addition to the statutory requirements, Alabama case law has added that the courts will enforce a covenant not to compete under § 8–1–1(b) only if:

a. The employer has a protectable interest;

b. The restriction is reasonably related to that interest;

c. The restriction is reasonable in time and place; and

d. The restriction imposes no undue hardship on the employee.

*Clark,* 592 So.2d at 565–66.

■ It is the public policy of Alabama that contracts restraining employment are disfavored. *See Nationwide Mut. Ins. Co. v. Cornutt,* 907 F.2d 1085, 1087 (11th Cir. 1990) (diversity jurisdiction); *see also Clark v. Liberty Nat'l Life Ins. Co.,* 592 So.2d 564, 565 (Ala.1992). All such contracts are potentially void. *Cornutt,* 907 F.2d at 1087. Alabama disfavors contracts restraining employment because "they tend not only to deprive the public of efficient service, but also . . . to impoverish the individual." *Clark,* 592 So.2d at 565. Alabama regards as important the loss of the employee's service and skill and the danger of his becoming a charge on the public. *Id.* at 567.

While Florida courts have stated that covenants not to compete are "vigorously disfavored by Florida courts," *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co.,* 761 So.2d 306 (Fla.2000), the legislature does not seem to agree. The legislature changed the law in 1996, and the statute governing covenants not to compete now has clauses that seem to be antithetical to Alabama's law. *See* Fla. Stat. ch. 542.335 (1997). One clause of the Florida statute provides that "[i]n determining the reasonability of a restrictive covenant, a court shall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." Fla. Stat. ch. 542.335(g)(1). Alabama law requires a consideration of the balance of the hardships between the parties, *supra.* Another clause that is antithetical to Alabama's general policy against covenants not to compete provides that "[a] court shall not employ any rule of contract construction that requires the court to construe a re-strictive covenant narrowly, against the restraint, or against the drafter of the contract." Fla. Stat. ch. 542.335(h). These clauses tend to favor the validity of covenants not to compete, as opposed to disfavoring them, as Alabama does.

ii. Alabama Has A Materially Greater Interest Than Florida In The Outcome Of This Case

Florida has no interest in this litigation for several reasons. First, the only reason it appears that Florida was included in the Non–Competition Agreement is because a predecessor of Plaintiff's parent corporation was located there.[30] Plaintiff's parent corporation, however, now resides in Georgia. Second, none of the parties reside in Florida. Plaintiff resides in Arkansas, and Defendants reside in Alabama. Alabama has a strong interest in litigation involving its citizens and businesses. Third, and perhaps most importantly, the focus of this litigation is the alleged deprivation of accounts Plaintiff had with Baptist Health Systems facilities in Alabama. Thus, the core of this dispute centers on activities affecting business relations in Alabama, not Florida.

iii. Alabama Would Be The State Of The Applicable Law In The Absence Of An Effective Choice Of Law

■ Plaintiff argues that the fall-back position is *lex loci contractus,* and that, therefore, if Florida law does not control, Arkansas law should. However, the Supreme Court of Alabama held in *Brown* that when the parties have chosen a particular state's law to govern a contract, as the parties have done here, the fallback position is not *lex loci contractus,* but rather the Restatement (Second) of Conflict of Laws §§ 187 and 188, which includes more than just *lex loci contractus.* The Supreme Court of Alabama, in *Brown,* relied on these principles to determine that Ala-

**30.** Tr. at 39.

bama law, rather than North Carolina law, applied to a covenant not to compete. 582 So.2d at 507–08.

 Section 188 basically provides that the law to be applied is the local law of the state which has the most significant relationship to the transaction and the parties. Applying the Restatement (Second) of Conflicts of Laws § 188 [31] and § 6,[32] the court finds that, considering all the circumstances, Alabama "would be the state of the applicable law in the absence of an effective choice of law by the parties." Considering the totality of the circumstances, Alabama has the most significant relationship to this controversy. As previously stated, all Defendants reside here, and the focus of the litigation is Baptist Health Systems in Alabama. Neither Florida nor Arkansas have a more significant relationship to this case.

### iv. Summary

Accordingly, the court finds that: 1) Florida law on covenants not to compete is contrary to a fundamental policy of Alabama; 2) Alabama has a materially greater interest than Florida in the outcome of this case; and 3) Alabama would be the state of the applicable law in the absence of an effective choice of law. Accordingly, Alabama law applies to the Non–Competition Agreement.

### b. Substantive Alabama Law On Covenants Not To Compete

By necessity, the court has already laid out the provisions of Alabama substantive law relating to covenants not to compete in the Choice of Law discussion, *supra*. Accordingly, the court progresses to further expound on those provisions and analyze the facts and apply the law to them to determine whether Plaintiff has proven a likelihood of success on the merits of its claim for breach of the Non–Competition Agreement with Trevor Oswalt.

### i. Statutory Requirements of § 8–1–1(b)

 An employer may prevent a former employee "[f]rom carrying on or engaging

**31.**
 (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
 (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
 (a) the place of contracting,
 (b) the place of negotiation of the contract,
 (c) the place of performance,
 (d) the location of the subject matter of the contract, and
 (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

**32.**
 (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
 (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and
 (g) ease in the determination and application of the law to be applied.

in a similar business and from soliciting old customers of such employer ...." Ala. Code § 8–1–1(b). The court finds that it is undisputed that Defendants carry on and engage in business that is similar to that of Plaintiff,[33] and that Plaintiff has a right to prohibit Defendant Trevor Oswalt, President of SCAS, from doing so, subject to geographical and other restrictions imposed by case law, which will be discussed, *infra*. In addition, Plaintiff has a right to prohibit Defendant Trevor Oswalt from soliciting Plaintiff's customers, once again subject to geographical and case law restrictions. This right to prohibit may also be extended to third parties with whom or for whom Plaintiff works. In *Daughtry v. Capital Gas Co.*, the Supreme Court of Alabama provided that, in a covenant not to compete, "[a] stranger to the covenant may ... properly be enjoined from aiding the covenantor in violating his covenant or receiving any benefit therefrom. So, a stranger to the covenant may ... be enjoined from, in conjunction with the covenantor, or with his assistance, conducting a business in competition with the covenantee...." 285 Ala. 89, 229 So.2d 480, 485 (1969) (quoting 94 A.L.R. 345). The *Daughtry* court also provided that "[a] person who has not executed or signed [a] contract or covenant ... [may] be restrained from engaging in the business in partnership with, or as an employee of, the covenanter [sic] or seller...." 229 So.2d at 485 (quoting *Yost v. Patrick*, 245 Ala. 275, 17 So.2d 240, 244 (1944)). *See also Norlund v. Faust*, 675 N.E.2d 1142, 1146–47, 1155–58 (Ind.Ct.App.1997) (enjoining covenantor's wife and her company from competing with husband's former employer based on husband's covenant not to compete); *McCart v. H & R Block, Inc.*, 470 N.E.2d 756, 761–62 (Ind.Ct.App.1984) (listing cases where parties not in privity of contract were enjoined from assisting oth-

ers in breaching covenant not to compete). *See also* Fed.R.Civ.P. 65(d) ("[e]very order granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.").

Thus, the court finds that Felicia Oswalt, Larry Mynott, SCAS, and Larry Oswalt may be prohibited from joining Trevor Oswalt in breaching, or causing him to be in breach of, his Non–Competition Agreement, if such an injunction is warranted. The court now addresses the elements of a covenant not to compete based on case law.

### ii. Protectable Interest

■ "In order to have a protectable interest the employer must possess a 'substantial right in its business sufficiently unique to warrant the type of protection contemplated by [a] noncompetition agreement.'" *Ex parte Caribe, U.S.A., Inc.*, 702 So.2d 1234, 1239 (Ala.1997) (quoting *DeVoe v. Cheatham*, 413 So.2d 1141, 1142 (Ala. 1982); *Cullman Broad. Co. v. Bosley*, 373 So.2d 830, 836 (Ala.1979)).

Alabama courts have held that protectable interests may include customer relationships, customer lists, pricing lists, etc., that are treated in a confidential manner, especially in a highly competitive business. *See, e.g., Ex parte Caribe, U.S.A., Inc.*, 702 So.2d 1234, 1237 (Ala.1997). In addition, "'if an employee is in a position to gain confidential information, access to secret lists, or to develop a close relationship with clients, the employer may have a protectable interest.'" *James S. Kemper & Co. Southeast*, 434 So.2d at 1384 (quoting *DeVoe*, 413 So.2d at 1143).

---

**33.** Tr. at 85–86.

However, if information is not treated as confidential (i.e. it is not difficult to obtain), then it will not rise to the level of a protectable interest. *See, e.g., Orkin Exterminating Co. v. Etheridge*, 582 So.2d 1102 (1991) (Orkin had no protectable interest in its customer list when customer lists were available to anyone who walked into Plaintiff's office).

In the case at hand, Plaintiff argues that information such as costs, customer lists, credit information, etc. has been treated as confidential, by limiting access to accounts on computers,[34] marking it as "Confidential," [35] etc., and that such information is not available to the public.[36] Defendant Trevor Oswalt, in his testimony, conceded that the information would be confidential to Plaintiff.[37]

Plaintiff has shown that Defendant Larry Mynott, Vice President of SCAS, sent a letter to Larry Oswalt, Vice President of Service Professionals, using confidential information of Plaintiff.[38] More specifically the letter contained a printout of the customer sales history between Plaintiff and Service Professionals.[39] The printout is traceable, by the salesperson number on the computer printout, to Trevor Oswalt, at a time when he worked for Plaintiff.[40] The purpose of the letter was to convince Service Professionals to do business with SCAS, of which Trevor Oswalt is now President, in the same areas in which Plaintiff was currently doing business with Service Professionals.[41] The letter was dated March 21, 2001, approximately five days after Trevor Oswalt's employment with Plaintiff ceased.[42] By April 2, 2001, Trevor Oswalt was President of SCAS.[43] Larry Mynott indicated in a letter that Trevor Oswalt was an employee of SCAS on February 8, 2001, in an attempt to assist Trevor in obtaining a mortgage.[44] However, Larry Mynott testified on the stand that he was lying in the letter.[45] Larry Oswalt denies that he is a member, officer, or employee of SCAS.[46] However, evidence shows that his name is listed as an owner of SCAS in several documents,[47] one of which is the registration of SCAS with the Alabama Department of Revenue.[48] Larry Oswalt contends the documents are inaccurate.[49] As previously stated, Larry Oswalt was suspended from Service Professionals in May, 2001 because of potential conflicts with SCAS, and was terminated in July, 2001.[50]

### iii. Restriction Reasonably Related To Protectable Interest

■ The restrictions in the covenant must be reasonably related to the protection of the employer's customer relationships, etc. *Clark*, 592 So.2d at 566. In this case, if the employer is found to have

---

34. Tr. at 32–33;

35. Pl.Ex. 6.

36. Tr. at 26.

37. Tr. at 93–94; 107–120.

38. Pl.Ex. 5, 15.

39. *Id.*

40. Tr. at 110–11.

41. Tr. at 158–59.

42. Pl.Ex. 15.

43. Pl.Ex. 13.

44. Tr. at 14.

45. Tr. at 154.

46. Tr. at 298.

47. Pl.Ex. 11–13, 19.

48. Pl.Ex. 13.

49. Tr. at 312–18.

50. Tr. at 323.

a protectable interest in its customer relationships, cost lists, customer histories, etc., then the covenant not to compete, as provided in the plain language of the contract, is reasonably related to that protectable interest.

### iv. Restriction is Reasonable in Time and Place

Alabama courts have held that employment contracts including covenants not to compete for two years are reasonable. *James S. Kemper & Co. Southeast,* 434 So.2d at 1384. In addition, as previously stated, Alabama courts have upheld restrictions that include part of Alabama, all of Alabama, and even more than Alabama. *Id.* at 1385 (1983) (citing *Parker v. Ebsco Indus., Inc.,* 282 Ala. 98, 209 So.2d 383 (1968) (Merrill, J.)).

■ In this case, the eighteen months provided in the Non–Competition Agreement, during which time Defendant Trevor Oswalt is prohibited from soliciting or providing services to Plaintiff's customers, is substantially likely to be found reasonable.

■ The geographic scope of the Non–Competition Agreement requires more discussion. The Non–Competition Agreement between Plaintiff and Trevor Oswalt prohibits him from soliciting or providing services to Plaintiff's customers in fourteen Arkansas counties delineated in the agreement. It seems likely to the court that the Non–Competition Agreement was not, on its face, unreasonable as to geographic scope. Fourteen Arkansas counties is likely a reasonable geographic area in which to be prohibited from competing with a former employer.

However, Plaintiff argues that Trevor Oswalt sold goods, while employed with Plaintiff, to a company called Service Professionals in Little Rock, Faulkner County, Arkansas, which is one of the fourteen counties delineated in the agreement. Service Professionals then took the goods sold by Plaintiff through Plaintiff's employee Trevor Oswalt and shipped them to Baptist Health Systems facilities in both Arkansas and Alabama. It is clear that SCAS currently services Baptist Health Systems facilities in Alabama with products similar to those formerly sold by Plaintiff to Service Professionals. Thus, Plaintiff argues, Defendant Trevor Oswalt, with the assistance of the other Defendants, has taken its customers by circumventing the covenant not to compete and selling straight to the Baptist Health Systems facilities in Alabama. Thereby, Plaintiff claims, Defendants are engaging in subterfuge to breach the Non–Competition Agreement not technically, but substantively. When Defendants began selling directly to Baptist Health Systems facilities in Alabama, Plaintiff was no longer able to sell to those customers through Service Professionals, depriving Plaintiff of income from those customers.

The logical response to Plaintiff's argument is to question whether Plaintiff could have prohibited Trevor Oswalt from selling to ultimate end users, anywhere in the world, that received products from one of Plaintiff's customers in one of the fourteen Arkansas counties delineated in the Non–Competition Agreement. The court is bound to answer yes, if doing so is an attempt to circumnavigate the Non–Competition Agreement by "cutting out the middle-man" who is a customer of Plaintiff in one of the fourteen Arkansas counties.[51] Covenants not to compete are allowed by law because they are necessary to protect

---

51. *See infra,* at 1206–1207, discussion of circumnavigating covenants not to compete and violating them by subterfuge.

businesses from unfair competition. If they are allowed to be circumvented by subterfuge, the court fails in its duty to uphold the law that protects them.

### v. Restriction Places No Undue Hardship On the Employee

Alabama courts have held that undue hardship is placed on an employee when the agreement:

> "imposes on the employee ... greater restraint than is necessary to secure to the business of the employer ... its legitimate protection, regard being had to the injury which may result from restraining the breach of the covenant in the loss of the employee's service and skill and the danger of his becoming a charge on the public."

*Nationwide Mut. Ins. Co. v. Cornutt,* 907 F.2d 1085, 1089 (11th Cir.1990) (quoting *Hill v. Rice,* 259 Ala. 587, 67 So.2d 789, 794 (1953); *Central Bank of the South v. Beasley,* 439 So.2d 70, 74 (Ala.1983); *Cullman Broadcasting Co. v. Bosley,* 373 So.2d 830, 836 (Ala.1979)).

 Basically it boils down to this: Alabama may find an undue hardship where the covenant prohibits the former employee from engaging in *the only trade he knew and could rely upon to support his dependents.* *Cornutt,* 907 F.2d at 1089. Trevor Oswalt has testified that if the preliminary injunction is granted, SCAS will not survive.[52] However, he admitted that he could go out and find a job paying $25,000 a year if a preliminary injunction was granted against his company.[53] Trevor Oswalt also testified that he may still be getting into the tobacco industry, where he could make over $100,000 a year.[54] Defendants have offered no evidence, besides Trevor Oswalt's testimony, that they will be put out of business if the

preliminary injunction is granted. As discussed in more detail in the balancing of harms factor regarding preliminary injunction, *infra,* such a self-serving statement by itself is insufficient evidence of hardship to withstand a preliminary injunction. *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1534 (11th Cir.1985). The court finds a lack of evidence supporting Trevor Oswalt's self-serving statement that SCAS will be put out of business if the injunction is granted, also substantially weakens Defendants' argument that it will suffer an undue hardship if the Non–Competition Agreement is enforced.

Although the issue has not been addressed in Alabama, courts in other states have held that when a company engages in subterfuge in order to circumnavigate a covenant not to compete, the company should be enjoined from violating the covenant. In *Arwell Div. of Orkin Exterminating Co. v. Kendrick,* a husband and wife were operating an exterminating company. 131 Ill.App.2d 632, 267 N.E.2d 352, 353–54 (1971). The husband had entered a covenant not to compete with his former employer, the plaintiff. *Id.* Defendants argued that the wife owned the business, and the husband was therefore not violating the covenant not to compete. *Id.* The trial court entered a preliminary injunction against the defendants, prohibiting them from competing against the husband's former employer. *Id.* The court found that the wife was the alter ego of the husband, and that "the trial court correctly held that her conduct of the business was a thinly veiled *subterfuge* designed to avoid her husband's obligation under the contract." *Id.* (emphasis added). *See also McCart,* 470 N.E.2d at 761–62 ("cooperative con-

---

**52.** Tr. at 366; 375.

**53.** Tr. at 375.

**54.** Tr. at 83, 140, 373.

duct [of husband and wife] amounted to *mere subterfuge* designed to avoid [wife's] obligation under the [franchise agreement] contract") (emphasis added) (citing *Kendrick*).

Substantial evidence in this case indicates that the Non–Competition agreement was circumnavigated by "cutting out the middle-man," Service Professionals (located in one of the fourteen Arkansas counties listed in the Non–Competition Agreement), and selling directly to an end user, Baptist Health Systems of Alabama, of which Defendants, including Trevor, had substantial knowledge. The court finds that in this case, it is substantially likely that a jury will find that Defendants acted jointly in engaging in subterfuge to circumvent Trevor Oswalt's Non–Competition Agreement.

### 2. *Confidentiality Agreement*

#### a. Choice Of Law

 The parties agree that the state of Arkansas provides the controlling law regarding the Confidentiality Agreement, and, as that is where the contract was signed, the rule of *lex loci contractus* establishes that Arkansas law does apply to the Confidentiality Agreement.

#### b. Substantive Arkansas Law On Confidentiality Agreements

Arkansas law is almost nonexistent on confidentiality agreements.[55] Most cases concerning confidential information in Arkansas relate to the Arkansas Trade Secrets Act. Ark.Code Ann. §§ 4–75–601 to 4–75–607. Only three cases provide insight into how Arkansas courts treat confidentiality agreements. First, the United States District Court for the Western Dis-

trict of Arkansas, in a case based on diversity jurisdiction, stated the following:

> The primary rule in construing the contract is to, if possible, ascertain and give effect to the parties' intentions when entering into the agreement. *Harris v. Stephens Prod. Co.*, 310 Ark. 67, 72, 832 S.W.2d 837 (1992). The court cannot imagine that the parties did not intend that all who had access to the disclosed material would be bound by the agreements. To hold otherwise would be to create an absurd result—contracting to assure confidentiality while requiring none involved to hold anything in confidence.

*Southwestern Energy Co. v. Eickenhorst*, 955 F.Supp. 1078, 1079–81 (W.D.Ark.1997).

*Eickenhorst* dealt with a confidentiality agreement between two oil companies. One of the oil companies claimed that the other potentially failed to pay it royalties. The charged company allowed the charging company to view a computer report reflecting production volumes and prices generated by one of them, but required that it be kept confidential. The issue was "whether a trade secrets act may be applied to prevent an attorney from breaching confidentiality agreements with a non-client in order to use information obtained from such agreements to establish a class action lawsuit against the non-client."[56] Although the factual scenario is different, the reasoning is still good and may be applicable to the confidentiality agreement before us, as coming from a federal court sitting in diversity jurisdiction in Arkansas.

*City Slickers, Inc. v. Douglas*, a case from the Arkansas Court of Appeals, is more factually similar to the case at hand.

---

55. As of 1997, there were no reported decisions in Arkansas concerning the enforceability of confidentiality agreements and/or the limitations on the use of such agreements. *See* Frank J. Bozzo, *Can You Keep A Secret?*

*A Primer On The Arkansas Trade Secrets Act*, Ark. L. Notes 103, 109 & n. 59 (1997).

56. *Id.* at 1083.

73 Ark.App. 64, 40 S.W.3d 805 (2001). In that case, a covenant was entered into between an automotive oil-changing business doing business in Arkansas and its general manager, to develop the Arkansas region. *Id.* at 807. The confidentiality agreement was somewhat similar to the one at issue. However, the plaintiff employer only had one customer in Little Rock (the geographic area at issue), the information the defendant employee used could have been obtained through phone books and surveys, the plaintiff did not market in Little Rock, and the plaintiff had no evidence that the defendant was using its information. *Id.* at 810–11. The court found the confidentiality and nondisclosure agreement to be an unreasonable and unlawful restraint of trade, and that it was an overly broad covenant not to compete masquerading as a confidentiality and nondisclosure agreement. *Id.* at 811.

Finally, and probably most importantly, the Supreme Court of Arkansas addressed a confidentiality agreement in ruling on an injunction in *Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Servs., Inc.*, 336 Ark. 143, 987 S.W.2d 642 (1999). The court faces a difficult problem, however, because the plaintiff in the case sought the injunction not over a breach of contract, but through the Arkansas Trade Secrets Act, based on the information contained in the confidentiality agreement. Still, the court's treatment of the confidentiality agreement is instructive. The court found that customer information, such as information concerning customers and work product, included in the confidentiality agreement, was protected by the Arkansas Trade Secrets Act, and that the employers took reasonable steps, such as restricting information to certain employees through passwords, etc., to protect the alleged trade secrets. *Id.* at 644–646. The court found it significant that the agreement lim-

ited the employees from disclosing the employer's information for one year, which the court deemed "[p]atently reasonable for the type of trade secrets covered, especially since the terms of [the employer's] customer contract generally run between one and five years." *Id.* at 646.

Based on the foregoing, the court finds that the Supreme Court of Arkansas would look at the Confidentiality Agreement at issue in this case and enforce it if it the court considered it to be reasonable. One matter the Supreme Court of Arkansas looked to in *Cardinal Freight Carriers, Inc.*, was the type of information contained in the agreement. In the agreement at hand, the information, such as customer lists, price lists, etc., is of the same ilk as that protected by the agreement in *Cardinal Freight Carriers, Inc.* Another matter the court looked to in *Cardinal Freight Carriers, Inc.* was that the employer sought to protect the information by using passwords, which the employer in the instant case also used. Finally, the *Cardinal Freight Carriers, Inc.* court considered significant the fact that the agreement had a time limit of one year on it, based on the length of the contracts between the employer and its customers. The Confidentiality Agreement in this case, however, has no time limit. Arkansas seems to consider information that should be protected indefinitely should be done so through the Arkansas Trade Secrets Act. In the instant case, the court finds, the Arkansas Supreme Court would likely find the Confidentiality Agreement valid, but impose an injunction only for a reasonable time.

The court notes that in this case, there is substantial evidence that confidential information of Plaintiff was disclosed to Plaintiff's competitor, SCAS. Cost schedules,[57] one of which was titled

---

57. Pl.Ex. 6–8, 18, 20.

"Unisource Confidential Distributor Cost Schedule," [58] were found in the offices of SCAS. Moreover, a confidential customer sales history of Plaintiff's was used by SCAS to convince Service Professionals to use SCAS as a supplier instead of Plaintiff.[59] The court sees no reason the principle delineated in the court's discussion of the Non–Competition Agreement, *supra,* that those who assist in breaching contracts may be enjoined from doing so, should not also apply to Confidentiality Agreements. The court finds that it is substantially likely that a jury will find that Defendants Trevor Oswalt and/or Larry Mynott breached, and/or Larry Oswalt and/or Felicia Oswalt assisted Trevor Oswalt and/or Larry Mynott, in breaching Confidentiality Agreements entered into with Plaintiff. Larry Oswalt admitted that information given to him by Trevor Oswalt, while Trevor Oswalt was employed by Plaintiff, was confidential to Plaintiff.[60] Such information was found in the offices of SCAS.[61]

### 3. *Alabama Trade Secrets Act*

■ Plaintiff claims that its customer histories, price lists, and cost information are trade secrets. The Alabama Trade Secrets Act defines a "trade secret" as information that:

a. Is used or intended for use in a trade or business;

b. Is included or embodied in a formula, pattern, compilation, computer software, drawing, device, method, technique, or process;

c. Is not publicly known and is not generally known in the trade or business of the person asserting that it is a trade secret;

d. Cannot be readily ascertained or derived from publicly available information;

e. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and

f. Has significant economic value.

Ala.Code § 8–27–2(1). In this case, customer histories, price lists, and cost information is all used in its business. Customer histories, price lists, and cost information may be considered compilations. Plaintiff has stated that this type of information is not public knowledge.[62] Defendants do not argue that the price and costs lists are generally known in the trade or business. As previously stated, the evidence shows that documents from Plaintiff's suppliers, one of which was marked "Unisource Confidential Distributor Cost Schedule," [63] was found in Defendants' office. While simply labeling information "confidential" does not make it a trade secret, in this case the court finds the information regarding Plaintiff's costs is not of the type generally available to the public. If a company's pricing information were available to the public, the company could not stay in business. For the same reason, such lists cannot be readily ascertained or derived from publicly available information. Information regarding costs in general may be public information, but not as to specific people or companies, who may receive discounts, etc. for buying in bulk or because of a long-time relationship with the seller.

Testimony also conflicts as to whether efforts to maintain the secrecy of the information were reasonable. Whether a com-

**58.** Pl.Ex. 20.

**59.** Pl.Ex. 5, 15.

**60.** Tr. at 299.

**61.** Tr. at 220–41; Pl. Exs. 18, 20.

**62.** Tr. at 26.

**63.** Pl.Ex. 20.

pany has made reasonable efforts to maintain the secrecy of the item in question was addressed by the Supreme Court of Alabama in the following manner:

> [a]fter reviewing the material presented by the defendants in support of their motion for summary judgment, and by [the employer] in opposition to the defendants' motion, this Court concludes that there is not a genuine issue of material fact regarding whether [the employer] made reasonable efforts to maintain the secrecy of the lists. According to answers provided by Allied to interrogatories propounded by the defendants, at least 10 Allied employees had free access to the lists. In addition, the lists were not marked "confidential"; the lists were taken home by employees; multiple copies of each list existed; and the information on the lists was contained in the receptionist's Rolodex file. In light of that evidence, we agree with the trial court's implicit holding that Allied did not meet its burden of showing that it had taken reasonable steps to ensure that the lists remained a "trade secret."

*Allied Supply Co., Inc. v. Brown,* 585 So.2d 33, 36 (Ala.1991).

Regarding customer lists as trade secrets in particular, the Supreme Court of Alabama has stated the following:

> [i]t is undisputed, as a general proposition of law, that customer lists may, in proper circumstances, be afforded the protection of a trade secret. The courts addressing this issue have required that the lists be something more than a list of readily ascertainable potential clients. Those lists that have been afforded protection as trade secrets have contained specific information about customers, for example, their buying habits. Additionally, in those cases, the information was treated by the claimant as secret. [The

plaintiff in this case] admits that it distributes to prospective clients a booklet that contains a listing of its clients. It is axiomatic that once made public, the customer list has no claim to trade secret protection.

*Public Systems, Inc. v. Towry,* 587 So.2d 969, 973 (1991) (citations omitted). In this case, Plaintiff testified that it required passwords on computers, and marked information as confidential. The court finds such efforts to be reasonable in attempting to maintain the secrecy of Plaintiff's information. Finally, the information has significant economic value. Defendant Larry Mynott testified that Trevor Oswalt was bringing in approximately $1.5 million per year gross revenue when he was working for Plaintiff, and a majority of it was from Service Professionals.[64]

Defendants' counsel does not attempt to rebut Plaintiff's arguments regarding the claim under the Alabama Trade Secrets Act in Plaintiff's Post–Hearing Memorandum Of Law In Support Of Motion For Preliminary Injunction, and the court is not going to dig through the record to do so for Defendants' counsel.

 A person is guilty of misappropriating trade secrets if:

(1) That person discovered the trade secret by improper means;

(2) That person's disclosure or use constitutes a breach of confidence reposed in that person by the other;

(3) That person learned the trade secret from a third person, and knew or should have known that (i) the information was a trade secret and (ii) that the trade secret had been appropriated under circumstances which violate the provisions of (1) or (2) above; or

(4) That person learned the information and knew or should have known that it

---

**64.** Tr. at 186–87.

was a trade secret and that its disclosure was made to that person by mistake.

Ala.Code § 8–27–3.

The information in this case is likely to be a trade secret. It is also clear that if one of the Defendants disclosed such information or used it, and that Defendant knew or should have known that it was a trade secret, that Defendant misappropriated it, because that Defendant will have breached a confidence reposed by Plaintiff.

The statutory remedies for misappropriating a trade secret include "injunctive and equitable relief as may be appropriate with respect to any actual or threatened misappropriation of a trade secret." Ala.Code § 8–27–4(1).

As previously stated, it is clear that information such as cost lists and customer sales histories were in the possession of SCAS, a competitor of Plaintiff, and that such information was obtained by SCAS through one or more of the Defendants. Accordingly, the court finds that there is a substantial likelihood that Plaintiff will succeed on the merits of this claim at trial.

4. *Summary Of Non–Competition Agreement, Confidentiality And Patent Agreement, And Trade Secrets Act*

Defendants argue that some of the information considered confidential by Plaintiff, such as customer sales histories, is provided routinely to Plaintiff's own customers, but, Defendants admit, such confidential information is not given to Plaintiff's competitors.[65] Plaintiff does not dispute that it gave its customers their own customer sales histories.[66]

However, Trevor Oswalt admits that while he was employed with Plaintiff, he gave Larry Oswalt, who was at Service Professionals, copies of Plaintiff's confidential cost information regarding distributors such as Windsor [67] and Tyco.[68] Brazil testified that it is not the practice of Plaintiff to give its customers confidential cost information.[69] Trevor Oswalt admitted this information would be considered by Plaintiff to be confidential.[70] Trevor provided this information to Larry Oswalt for approximately three years.[71]

Whether through Larry Oswalt, Trevor Oswalt, or Larry Mynott, customer sales history information got into the hands of SCAS, and was used to compete against Plaintiff for business with Service Professionals.[72] In addition, Plaintiff's confidential cost information, such as that from Windsor and Tyco, was found in the offices of SCAS.[73] Based on the foregoing, the court finds that Plaintiff has a substantial likelihood of success on its claims.

### B. *Irreparable Injury*

Plaintiff alleges that it lost its accounts with Baptist Health Systems facilities in Alabama due to Defendants' alleged misconduct. "The former Fifth Circuit held that the loss of customers and goodwill is an 'irreparable' injury." *Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991); *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir., Unit A, 1981).

---

65. Tr. at 163.

66. Tr. at 344.

67. Def. Trial Ex. 6.

68. Def. Trial Exs. 7–8. Tr. at 137.

69. Tr. at 343–44.

70. Tr. at 113–21.

71. Tr. at 137–38.

72. Tr. at 158–61.

73. Tr. at 220–41.

The court finds necessary, however, a more detailed discussion of irreparable injury. A customer is invaluable to a company, because in order to have a good reputation and to be considered reliable, a company must maintain its existing customers. Being deprived of a customer deprives a company of more than just that customer, it also deprives the company of its reputation and reliability in the industry. The amount of damages which the company has lost and will lose until the time of trial is measurable. The Complaint provides that Plaintiff has lost as much as $250,000 in revenue thus far under the agreement, and testified at the hearings that it stands to lose approximately $40,000 per year in profits from the loss of the business with Baptist Health Systems facilities in Alabama.[74] While the damages may be calculable for the loss of the customer from the time of the alleged breach of the Non–Competition and Confidentiality Agreements until the date of trial, it is practically impossible to calculate the loss of the customer for eternity. The court does not know whether or not Plaintiff will be able to retrieve the customer, and if it does, what loss Plaintiff will have received in lowering prices to do so. In addition, under these contracts, Plaintiff's recovery would be limited. Damages would likely be limited to the amount Plaintiff lost to the date of trial. Consequential damages are only available if foreseeable, and in this case, it would be difficult to foresee all of the damages incurred as a result of the breach.

Damages for breach of the Alabama Trade Secrets Act would allow a broader base of recovery for Plaintiff, and thus would weigh against a finding that the harm was irreparable. However, the exemplary damages available under the Alabama Trade Secrets Act, § 8–27–4, are only available in an amount equal to the extent of actual damages, and, as the court has shown, the amount of actual damages is likely irreparable. If Plaintiff proves that Defendants acted fraudulently, then exemplary damages may be awarded, and Plaintiff could get a fuller measure of recovery, but would still not recoup its lost reputation or the business with Baptist Health Systems facilities for eternity. Thus, the court finds that this element of the preliminary injunction tips slightly in favor of Plaintiff.

### 1. Balance Of Harms

Plaintiff must show that the threatened injury to Plaintiff outweighs the threatened harm the injunction may do to Defendants. Plaintiff argues that if the preliminary injunction is granted, it will continue to lose money because Defendants have taken its customer. The vast majority of Plaintiff's arguments relating to balance of harms is dedicated to arguing that Defendants will not be harmed if the injunction is granted. Plaintiff argues that Defendants' harm will not outweigh the harm to Plaintiff for the following reasons: 1) Defendant Trevor Oswalt admitted he could find other employment; 2) Plaintiff testified Defendant Trevor Oswalt could still potentially obtain a job paying over $100,000 per year; 3) Defendant Larry Mynott claims he is an expert in this field and has testified that he has other business interests; 4) Larry Oswalt should not be considered because he claims he is not affiliated with SCAS; 5) SCAS can solicit other customers; 6) any harm SCAS would lose from the injunction being granted as to Baptist Health Systems facilities in Alabama should not be considered because any accounts with such facilities were obtained illegally.

Defendants argue that if the injunction is granted, they are out of business. The

---

74. Tr. at 390.

Eleventh Circuit Court of Appeals faced this issue in the trademark infringement case of *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525 (11th Cir.1985). In *E. Remy Martin & Co.,* the district court had denied the preliminary injunction because it found that the plaintiff did not have a likelihood of success on the merits and there was not a substantial threat of irreparable injury. *Id.* at 1533–34. The Eleventh Circuit disagreed. *Id.*

The Eleventh Circuit went on to address the balance of harms element of the preliminary injunction, which the district court did not address because it found the plaintiff could not show a likelihood of success on the merits or a substantial threat of irreparable injury. *Id.* The Eleventh Circuit found that "the only evidence on the record indicating the harm an injunction would bring to [a party against whom the preliminary injunction was sought] is his self-serving statement that such an injunction would put him out of business." *Id.* at 1534. The court found, however, that the party against whom the preliminary injunction was sought had a business which had survived for five years without engaging in the conduct which was the basis of the preliminary injunction, and that the party against whom the preliminary injunction was sought had significant business in addition to that which was sought to be enjoined. *Id.* In addition, the party against whom the injunction was sought was a large company. *Id.* at 1528.

The court found that the harm to the plaintiff weighed in favor of granting the preliminary injunction, and, because the court found a likelihood of success on the merits, a substantial threat of irreparable injury, and that granting the injunction would not disserve the public interest, held that the district court abused its discretion in not granting the preliminary injunction.

This case is similar to *E. Remy Martin & Co.,* in some ways, yet dissimilar in others, such that the considerations in *E. Remy Martin & Co.* alone are insufficient to show which party would incur the greatest harm if the injunction were or were not granted. Here, as in *E. Remy Martin & Co.,* the only evidence of that Defendants present regarding their claim that they will go out of business if a preliminary injunction is granted against them, is a self-serving statement by Defendant Trevor Oswalt. No financial information of any sort has been submitted to the court by Defendants.

The difference between this case and *E. Remy Martin & Co.,* however, is that Defendants do not have a five year history of survival without engaging in the conduct forming the basis of Plaintiff's claim for the preliminary injunction, nor do Defendants have other significant business than that which forms the basis of the preliminary injunction claim. SCAS is a much smaller company than the defendant in *E. Remy Martin & Co.,* and than Plaintiff in this case. The Seventh Circuit Court of Appeals has held that "[r]elative size is relevant where, one party, being small, and weak, faces bankruptcy if the preliminary injunction is granted or denied . . . ." *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.,* 780 F.2d 589, 598 (7th Cir.1986) (citations omitted). *See also Bell & Howell Document Mgmt. Prods. Co. v. Altek Systems,* 132 F.3d 701, 708 (Fed.Cir.1997) (district court did not err in considering relative size of parties, but would have erred if it had relied exclusively on size of parties in its decision).

On the other hand, in *Ty, Inc. v. Jones Group, Inc.,* a magistrate judge found that even though the defendant claimed it would be put out of business, the balance of the harms weighed in favor of granting the preliminary injunction against the de-

fendant. 237 F.3d 891, 902–04 (7th Cir. 2001). The magistrate judge stated that he had no desire to put the defendant out of business, but he had seen no evidence that granting the preliminary injunction would be unjust, due to the defendant's conduct which formed the Plaintiff's basis of the claim for the preliminary injunction. *Id.* The defendant had known that it would be infringing a trademark when it produced its product, because the plaintiff had sent him a cease and desist letter, yet the defendant insisted on producing the product anyway. *Id.* The Seventh Circuit affirmed the magistrate judge's decision, noting that the magistrate judge found that a $500,000 bond would compensate the defendant for any harm that may result from the preliminary injunction. *Id.*

█ The principle the court derives from the above mentioned cases is this: ordinarily, where a party produces evidence that it will be put out of business if a preliminary injunction is granted or denied, the balance of harms should weigh in favor of that party, especially when there is a great disparity between the size of the parties; however, if the party knowingly and illegally placed itself in the position to be placed out of business if the preliminary injunction was granted or denied, the balance of harms should weigh against that party.

█ In this case, the court finds the balance of harms weighs in favor of Plaintiff for three reasons. First, Defendant has failed to produce evidence that it will be put out of business if the preliminary injunction is granted. The only evidence pointed to in Defendant's Post–Hearing Reply Brief In Oppositions To Motion For Preliminary Injunction is Defendant Trevor Oswalt's statement that if the preliminary injunction is issued, SCAS is out of business.[75] In fact, Plaintiff presented a SCAS document signed by Larry Mynott, presenting approximately 143 target customers of SCAS, each with over 100 employees.[76] Second, Defendants knowingly put themselves in a situation where they may be in violation of Defendant Trevor Oswalt's Non–Competition Agreement or Confidentiality Agreement; Defendant Larry Mynott's Confidentiality Agreement; or the Alabama Trade Secrets Act. Defendants sent a letter to Service Professionals, using confidential information of Plaintiff (a customer sales history) "begging" Service Professionals to use SCAS because it could save Service Professionals money over what it was paying Plaintiff.[77] In addition, confidential information of Plaintiff, including cost schedules from the companies from whom it purchased supplies to sell to its customers, was found in the offices of SCAS.[78] Defendants knew or should have known that this information was confidential. Trevor Oswalt and Larry Mynott both signed Confidentiality agreements informing them that such information was confidential.[79] As previously stated, Larry Oswalt admitted that information given to him by Trevor Oswalt, while Trevor Oswalt was employed by Plaintiff, was confidential to Plaintiff.[80]

Third, the court can require Plaintiff to post a bond in an attempt to sufficiently compensate Defendants if the court grants the preliminary injunction and a jury finds that a permanent injunction should not issue against Defendants, whereas the court cannot require Defendants to post a

---

75. Defs. Post–Hr'g Reply Br., ¶ 5 (citing Tr. at 366).

76. Pl.Ex. 22.

77. Tr. at 158–161; Pl. Trial Exs. 5, 18.

78. Tr. at 111–20; 232–41; Pl. Trial Exs. 6–8, 18–20.

79. Pl. Exs. 2, 16.

80. Tr. at 299.

bond to attempt to sufficiently compensate Plaintiff if the court denies the preliminary injunction and a jury finds that a permanent injunction should have been granted against Defendants.

### 2. *Public Interest*

■ Defendants argue that if the court should not grant the preliminary injunction because "if all [a big company has] to do to quash small start up businesses is run to court and immediately litigate, a terrible message is sent to those who believe in competition."[81] In addition, Defendants argue, if the court grants the preliminary injunction, it is "sending the message that you compete [with the big corporations] and you face a law suit and a federal court approving all your contracts."[82]

Plaintiff, on the other hand, argues that if the court denies the preliminary injunction, "a message will be sent that it is acceptable for people to steal trade secrets. It would also signal that the law does not enforce binding contracts and confidentiality agreements."[83]

The court wants to make clear that it is doing none of the above. These are not public policy arguments. The court is not "sending" any type of message or signal. Rather, the court is applying law to facts to come to a resolution of this matter.

Defendants offer one true public policy argument: that Defendants sell supplies to hospitals, which cost is passed on to insurance companies, who in turn pass the cost on to consumers. However, this public policy argument fails respecting the claims regarding covenants not to compete, confidentiality agreements, and trade secrets in this case. It is well-established that such claims are allowed, despite their anticom-

petitive nature, because companies need them to survive. Companies have a legitimate public interest in keeping certain information confidential and maintaining their clientele. The court finds that no public interest will be disserved if the preliminary injunction is granted in this case.

### 3. *Conclusion*

Based on the foregoing, the court finds the following:

1) it is substantially more likely that Plaintiff will prevail on at least one of its claims for a permanent injunction at trial;

2) Plaintiff has shown that it will suffer irreparable injury if the preliminary injunction is not granted;

3) the balance of harms tips slightly in favor of Plaintiff; and

4) granting a preliminary injunction in this case will not disserve the public interest.

The court has no desire to put Defendants out of business. However, the court finds that it is substantially likely that Defendants illegally obtained confidential information of Plaintiff, and used it to compete with Plaintiff, thereby breaching Trevor Oswalt's Non–Competition Agreement, the Confidentiality Agreements signed by both Trevor Oswalt and Larry Mynott, and/or the Alabama Trade Secrets Act. Accordingly, the court finds that Plaintiff is entitled to a preliminary injunction.

### 4. *Bond*

When a preliminary injunction is issued, Rule 65 of the Federal Rules of Civil Procedure requires the court to have the Plaintiff post a bond in an amount that would compensate Defendants if Defendants should win at the trial on the permanent injunction. The court considers the

---

81. Resp. To Pl. Post Hr'g Mem. Of Law in Supp. Of Mot. For Prelim. Inj. (no pagination provided).

82. *Id.*

83. Pl. Post–Hr'g Reply Br. In Supp. Of Mot. For Prelim. Inj., at 5.

following when determining the amount of a bond: 1) Defendants currently receive around $150,000 per year net profit from the Baptist Health System facilities account; 2) if wrongfully enjoined, Defendants will be out of business, and will require capital to restart the business, or to reimburse them for the period during which they sought other employment; 3) interest accrued; and 4) possible attorney's fees. The trial for the permanent injunction will likely be in approximately one year. Considering the circumstances, the court finds that for a year, a bond of $400,000 should be made available, against which Defendants may proceed if a jury later determines that the preliminary injunction was errantly issued. If a jury later determines the court was in error, Defendants will still have to prove their damages to collect from the bond.

## IV. ORDER

Based on the foregoing, pursuant to Rule 65 of the Federal Rules of Civil Procedure, it is CONSIDERED and ORDERED that Plaintiff's Motion For A Preliminary Injunction be and the same is hereby GRANTED and that Defendants are hereby ENJOINED and RESTRAINED, directly or indirectly, whether alone or in concert with others, including any officer, agent, employee, representative or attorney, until further order of the court from:

1) using or disclosing confidential trade secret information of Unisource, including, but not limited to, models, drawings, memoranda, and other materials, documents or records of a proprietary nature; information relating to research, finance, accounting, sales personnel, management and operations, and information particularly relating to customer lists, price lists, customer service requirements, costs of providing services and equipment, and equipment maintenance costs; and

2) engaging in the sale of, solicitations of orders for, or providing services for any product or goods formerly solicited or sold to Baptist Health Systems facilities in the state of Alabama by Trevor Oswalt as an employee of Unisource, through Service Professionals.

It is further CONSIDERED and ORDERED that Plaintiff POST security with the Clerk of the Court in the amount of $400,000 on or before January 2, 2002.